# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: JUNE 13, 2019
NOT TO BE PUBLISHED

Supreme Court of Kentucky

FINAL

2018-SC-000159-MR

DATE 7/5/19 Kim Redmon, DC

JANICE WHITESIDE                                         APPELLANT


ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.        HONORABLE JUDITH E. MCDONALD-BURKMAN, JUDGE
NO. 16-CR-001433


COMMONWEALTH OF KENTUCKY                                  APPELLEE


**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING**

Janice Whiteside appeals as a matter of right from the Jefferson Circuit Court judgment sentencing her to 20 years in prison for twelve counts of sexual offenses. The charges stemmed from Whiteside's alleged sexual abuse of a minor for a period of more than two years. Whiteside now alleges several errors on appeal, asking this Court to vacate the trial court judgment and remand the case for further proceedings. Finding no error, we affirm the trial court.

**FACTS AND PROCEDURAL HISTORY**

In October 2013, M.W., who was eleven years old at the time, moved into a duplex with his parents and sisters. The family lived in one half of the duplex which was owned by Janice Whiteside. Whiteside, M.W.'s second cousin, resided in the other half of the duplex with her mother and sister.

Shortly after the family moved in, the father's truck broke down and Whiteside offered to drive M.W. to school. Whiteside gave M.W. rides to school for approximately one year. Every morning, M.W. would go into Whiteside's house through her back door and wake her up to take him to school. Outside of the trips to school, M.W. and Whiteside, and occasionally his sister, would spend time together in her home.

During trial, M.W. described numerous instances of sexual activity and other criminal conduct that occurred between himself and Whiteside. He testified that while he was at her house, Whiteside showed him pornography on her iPad and performed oral sex on him when he was just eleven years old. Thereafter, Whiteside would routinely perform oral sex on him on the mornings she took him to school. M.W. also described the first instance when the oral sex progressed to intercourse, which occurred when he was twelve years old. He further testified that Whiteside would buy him gifts, such as a moped, new cell phones, and shoes, and give him cash to keep him from disclosing the extent of their relationship. M.W. estimated that he had received over $5,000 from Whiteside. He used the phones she gave him to communicate with her on a messaging application, and the two exchanged nude photographs of themselves on one occasion.

He also described another incident of oral sex when he was twelve and he and his sister were hanging out with Whiteside at her residence. He and Whiteside went to an empty room so Whiteside could perform oral sex on him and his sister walked in. His sister testified and recalled what she had seen,

and further corroborated M.W.'s testimony that Whiteside gave him numerous gifts. M.W. described when he and Whiteside had sexual intercourse a second time, when he was fourteen, and other instances where she performed oral sex on him. In addition to the gifts, Whiteside would also provide M.W. with drugs and alcohol for him and his friends. Beyond M.W.'s and other family members' testimony, serological and DNA analysis revealed the presence of M.W.'s semen on Whiteside's mattress cover, and law enforcement officers testified about the steps taken to remove data from the cell phones involved in the crimes.

At the close of the evidence, the trial court instructed the jury on one count of first-degree sodomy, one count of second-degree rape, two counts of second-degree sodomy, one count of third-degree rape, two counts of third-degree sodomy, one count of possession of matter portraying a sexual performance by a minor, one count of unlawful use of electronic means to induce a minor to engage in a sexual or other prohibited activity, one count of second-degree unlawful transaction with a minor, and three counts related to distribution of obscene matters to minors. The jury convicted Whiteside on all counts except the first-degree sodomy count. The jury recommended a 45-year sentence, but Whiteside was sentenced to the maximum statutorily available sentence of 20 years in prison. Whiteside appeals, raising six issues for review, discussed below in turn. Additional facts will be developed as necessary.

## ANALYSIS

Whiteside argues on appeal that (1) the jury was erroneously instructed; (2) the Commonwealth improperly questioned the jury panel during voir dire;

3

(3) the trial court erred by denying her motion for directed verdict on one of the two rape counts; (4) the trial court improperly allowed bolstering of M.W. even though his credibility was not attacked; (5) palpable error occurred during closing arguments when the Commonwealth commented on Whiteside's silence and (6) cumulative errors during trial resulted in fundamental unfairness.

## I.  The jury was not erroneously instructed.

Whiteside argued at trial that it was error to include factual identifiers in the jury instructions to distinguish similar counts, citing specific examples contained in certain instructions.  The trial court overruled the objection, and Whiteside raises the same issue on appeal, arguing that the following jury instructions were improper:

<u>INSTRUCTION NO. 3</u>

You will find the defendant guilty of Sodomy in the Second Degree under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

(A) That in Jefferson County between the 20th day of March, 2014 and the 19th day of March, 2015, the defendant engaged in deviate sexual intercourse with M.W. when she put her mouth on his penis, and she gave M.W. approximately $50, and this was the first time he received money;

AND

(B) That at the time of such intercourse, the defendant was 18 years of age or older and M.W. was less than 14 years of age.

4

## INSTRUCTION NO. 4

You will find the defendant guilty of Sodomy in the Second Degree under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

(A) That in Jefferson County between the 20th day of March, 2014 and the 19th day of March, 2015, she engaged in deviate sexual intercourse with M.W. when she put her mouth on his penis, and M.W.'s sister, S.W., walked in on them, and he received a PlayStation 3 as a gift;

AND

(B) That at the time of such intercourse, the defendant was 18 years of age or older and M.W. was less than 14 years of age.

## INSTRUCTION NO. 6

You will find the defendant guilty of Sodomy in the Third Degree under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

(A) That in Jefferson County between the 20th day of March, 2014 and the 19th day of March, 2015, the defendant engaged in deviate sexual intercourse with M.W. when she put her mouth on his penis while they were at Brenda's house, and it was the summer break before his seventh grade year;

AND

(B) That at the time of such intercourse, the defendant was 21 years of age or older and M.S. was less than 16 years of age.

Whiteside states that these instructions contain superfluous information that improperly emphasized specific testimony and diluted the guarantee of a

5

unanimous verdict. Specifically, Whiteside contends that the testimony at trial was unclear as to the certainty of M.W.'s age during certain events, and that the Commonwealth attempted to bolster the certainty by tying the sex acts to questionably correlated events in the instructions. We review the content of jury instructions *de novo. Commonwealth v. Caudill*, 540 S.W.3d 364, 366-67 (Ky. 2018).

In *Harp v. Commonwealth*, 266 S.W.3d 813, 818 (Ky. 2008), the defendant was charged with seven counts of sexual abuse and the jury was given identical instructions, later returning seven indistinguishable guilty verdicts. This Court held that jury instructions with no identifying characteristics to require the jury to differentiate the specific acts constituting each crime violated the unanimous verdict requirement of § 7 of the Kentucky Constitution. *Id.* Like *Harp*, the trial court in this case was faced with multiple counts of the same crime, requiring jury instructions that properly distinguished which acts constituted which crimes.

Whiteside notes that Kentucky law has long called for bare bones jury instructions, meaning, as a general matter, "evidentiary matters should be omitted from the instructions and left to the lawyers to flesh out in closing arguments." *Baze v. Commonwealth*, 965 S.W.2d 817, 823 (Ky. 1997). The Court remains committed to the bare bones principle, "confident that it works well in most cases to 'pare down unfamiliar and often complicated issues in a manner that jurors, who are often not familiar with legal principles, can understand.'" *Harp*, 266 S.W.3d at 819. However, in a case involving multiple

6

counts of the same offense, the law requires specific identifiers in each count to ensure a unanimous verdict. *Id.* "So a failure to include at least some basic evidentiary identification in the sexual abuse instructions at hand was a misstatement of the law. Furthermore, the lack of specificity in the instructions readily lends itself to a potential unanimity problem." *Id.*

This Court recently revisited the unanimous verdict issue in *King v. Commonwealth*, 554 S.W.3d 343, 350-51 (Ky. 2018), again holding that "when a trial court fails to adequately distinguish one instruction from another, . . . a unanimous-verdict violation arises." *King* similarly included multiple counts of sexual abuse and, despite ample evidence that King committed the crimes, it could not be determined, based on the instructions, that all jurors agreed upon the criminal acts for which King was convicted. *Id.* at 352.

In Whiteside's case, any specific information included in the jury instructions helped to ensure she received a unanimous verdict. Since the three instructions in question involve three sodomy offenses, these additional references to specific acts were necessary to ensure that the jury differentiated between the varying instances of sodomy. The jury instructions included all the essential elements of the crimes, and if anything, it required the Commonwealth to prove the additional factual elements as well. For example, as to Instruction No. 5, the Commonwealth had to prove, beyond a reasonable doubt, not only that Whiteside engaged in sexual intercourse with M.W. while he was under the age of sixteen, but also that the intercourse occurred on Whiteside's bed. During deliberations, the jury sent out a note asking the trial

7

court whether the location of the intercourse mattered, and the court, with agreement of the parties, responded "sorry, cannot answer." This shows that the jury considered each element of the instruction when determining whether Whiteside was guilty of the crime. Since the additional elements in the instructions helped ensure a unanimous verdict, the jury was not erroneously instructed.

Whiteside also argues that the jurors were confused by the instructions and were given further confusing written directions from the trial court. The jury questioned Instruction No. 2, which states:

> You will find the defendant guilty of Rape in the Second Degree under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
>
> (A) That in Jefferson County between the 20th day of March, 2014 and the 19th day of March, 2015, she engaged in sexual intercourse with M.W., and this took place on the defendant's bed;
>
> AND
>
> (B) That at the time of such intercourse, the defendant was 18 years of age or older and M.W. was less than 14 years of age.

While deliberating, the jury sent a question to the court asking for guidance on the dates. The question was read into the record: "clarification on date. Shouldn't it be March 19, 2016 since he isn't 14 until that date, conflicts with b." During deliberations about how to respond, the Commonwealth claimed that they did not mean to limit the instruction to when M.W. was twelve and that the jury should be allowed to consider age thirteen as well. Whiteside

8

objected, stating that the time period between 2014 and 2015 still fit the statute, since M.W. was less than fourteen at the time and that the instructions should not be changed because it would confuse the jury. Whiteside objected and moved for a mistrial, but the trial court ultimately responded to the jury's question, stating that "2015" in the instruction should be "2016" for Instruction Nos. 2, 3, 4 and 6.

Additionally, the jury questioned Instruction No. 5, asking why the location of the sexual intercourse mattered. By agreement of the parties, the trial court responded stating it could not answer the question. Whiteside uses this question and the question regarding Instruction No. 2 to argue that the jury was confused by the instructions and to further argue that the trial court should have used bare bones jury instructions. Whiteside states that these additional pieces of information, such as stating in Instruction No. 5 that the intercourse occurred on the bed and stating the events occurred during summer break confused the jury and emphasized certain testimony while diluting the importance of believing the instructions beyond a reasonable doubt. These arguments are unconvincing because of the constitutional right to a unanimous verdict.

As noted, the additional information was necessary to differentiate the many instances of sexual abuse to guarantee a unanimous verdict. Additionally, as Whiteside's counsel pointed out, 2015 versus 2016 in the instructions did not matter under the statute because whether M.W. was twelve or thirteen at the time, he was still less than fourteen years old.

Adjusting the time frame to adequately reflect the proof presented at trial cleared up the confusion the jury complained about. The trial court's clarification conformed the instructions to the language in the indictment, which correctly states the statutory time frame in relation to M.W.'s date of birth. Accordingly, the trial court's responses to the questions were not erroneous, and the jury instructions were proper.

## II. The trial court did not abuse its discretion in allowing the Commonwealth to question the voir dire panel about delayed reporting of sexual abuse.

Whiteside next argues that the trial court abused its discretion in allowing the Commonwealth to question the venire regarding potential reasons for delayed reporting of sexual abuse. After the question, Whiteside objected and argued that the Commonwealth was attempting to bolster M.W.'s testimony and poll the jury. The trial court responded that there was no one to bolster as there had been no testimony. The trial court also ruled that the Commonwealth was not impermissibly attempting to have jurors commit to a certain view of the events. On appeal, Whiteside specifically argues that the Commonwealth's question regarding delayed reporting was an attempt to poll the jurors on their belief in Child Sexual Abuse Accommodation Syndrome (CSAAS) and she cites case law in which CSAAS testimony was held inadmissible because it lacks scientific acceptance. In some cases, parties attempt to use a CSAAS theory to explain why child sex abuse victims may delay reporting the abuse. Therefore, Whiteside assumes that the

10

Commonwealth asked potential jurors about possible reasons for delayed reporting to bolster their case against Whiteside.

"The trial judge has broad discretion in the area of questioning on voir dire." *Ward v. Commonwealth*, 695 S.W.2d 404, 407 (Ky. 1985). We review a trial court's ruling on voir dire questioning for an abuse of discretion. The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). Whiteside argues that the Commonwealth's question amounted to having potential jurors indicate in advance a belief in symptoms associated with CSAAS. Kentucky has prohibited CSAAS testimony. *Bussey v. Commonwealth*, 697 S.W.2d 139, 141 (Ky. 1985).

Here, the Commonwealth did not use clinical terminology, or present any testimony regarding CSAAS. The Commonwealth did not make any statements regarding the credibility of victims who delay reporting abuse, and after various jurors offered possible reasons for delayed reporting, the Commonwealth simply stated that those were all good answers. Whether jurors can fathom reasons why a sex abuse victim may delay reporting does not affect their view of the witnesses' credibility or their findings regarding the statutory elements of the crimes. A juror may consider many factors in determining the credibility of a witness, such as the clarity of the witness's recollection, demeanor, interest in the proceedings, or lack thereof, and the overall reasonableness of the testimony. "Assessing the credibility of a witness and the weight given to [his]

11

testimony rests 'within the unique province of the jury . . . .'" *Ross v. Commonwealth*, 531 S.W.3d 471, 477 (Ky. 2017) (quoting *McDaniel v. Commonwealth*, 415 S.W.3d 643, 654 (Ky. 2013)). It is unlikely that any potential jurors improperly considered the Commonwealth's voir dire question in assessing witness testimony during trial. We find nothing unreasonable about the trial court allowing the Commonwealth to ask this question and no abuse of discretion.

### III. The trial court did not err in denying the motion for directed verdict on one rape count.

Whiteside argues that the trial court erred in denying her motion for directed verdict for one of the rape counts because M.W. was unclear about how many times he and Whiteside had intercourse and when it occurred. She states that, given the evidence, it was unreasonable for the jury to find beyond a reasonable doubt that sexual intercourse had occurred more than once.

A trial court's ruling on a motion for directed verdict is reviewed using the standard set forth in *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991):

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.
>
> On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly

12

unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.

At trial, M.W. initially testified that he and Whiteside had sexual intercourse one or two times. He also testified that he was twelve years old the first time, and fourteen years old the second time. After stating that he was fourteen years old the second time, he stated that he and Whiteside only had sexual intercourse twice. This testimony was sufficient to send both rape counts to the jury. The fact that M.W. initially testified that he and Whiteside had sexual intercourse "one or two times," and later stated more definitively that it was twice does not entitle Whiteside to a directed verdict. "Credibility and weight of the evidence are matters within the exclusive province of the jury." *Commonwealth v. Smith*, 5 S.W.3d 126, 129 (Ky. 1999). "The court acting as an appellate court cannot . . . substitute its judgment as to credibility of a witness for that of the trial court and the jury." *Brewer v. Commonwealth*, 206 S.W.3d 313 (Ky. 2006). Therefore, it was left to the jury to decide whether they believed M.W.'s testimony or felt that he lacked credibility for initially stating one or two times and later stating more conclusively that it occurred twice.

Further, the testimony that the intercourse occurred once or twice is not inconsistent with the later testimony that the intercourse occurred twice. M.W. was eventually able to state his age at the time of both rapes, and even provided specifics about where the intercourse occurred the second time. The role of the trial court was to view the evidence in a light most favorable to the Commonwealth in determining whether there was sufficient evidence to support a guilty verdict on both counts. After reviewing the trial testimony, it

13

was not unreasonable for a juror to find that Whiteside and M.W. had intercourse twice and therefore the trial court did not err in denying the motion for directed verdict.

## IV.    The trial court did not improperly allow bolstering of M.W.'s testimony.

Whiteside argues that the trial court improperly allowed other witnesses to bolster M.W.'s testimony, despite no attack on his credibility. During trial, the Commonwealth called a forensic investigator who interviewed M.W. in May 2016. The Commonwealth asked her if M.W. made a disclosure to her, and she stated that he had. Whiteside objected, and the parties had a bench conference with the judge. The recorded bench conference is inaudible, but both parties state that Whiteside alleged the investigator's statement constituted bolstering, but that the objection was overruled. Following the bench conference, there was no further testimony from the forensic investigator.

Later, M.W.'s aunt testified, and the Commonwealth asked why, after learning about the sexual abuse, they did not report it to the police immediately. She responded that they had to think about the children's living situation, since Whiteside owned the duplex where they resided. Additionally, M.W.'s uncle testified that he spoke with M.W. about the oral sex after the allegations arose. Whiteside objected after both statements were made by the aunt and uncle, but again the bench conference recordings with the parties and the trial court are inaudible. The parties state that after Whiteside

14

objected to the uncle's testimony, the trial court ruled that the Commonwealth should not ask the uncle any more questions and thereafter the witness was dismissed. Additionally, after the objection and bench conference regarding the aunt's statement, the aunt continued her testimony but gave no other information about why they waited to report the abuse to the police.

Trial court evidentiary rulings are reviewed for an abuse of discretion. *Woodard v. Commonwealth*, 147 S.W.3d 63, 67 (Ky. 2004). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945. In this case, there was no improper bolstering of M.W.'s testimony, and no error in allowing the testimony.

"Generally, 'a witness's credibility may not be bolstered until it has been attacked.'" *Harp*, 266 S.W.3d at 824 (quoting *Miller ex rel. Monticello Baking Co. v. Marymount Medical Center*, 125 S.W.3d 274, 283 (Ky. 2004)). Whiteside cites *King v. Commonwealth*, 472 S.W.3d 523 (Ky. 2015), to support her contention that the forensic interviewer's testimony implied to the jury that an expert had determined that this case was worth prosecuting, thereby bolstering M.W.'s testimony. But *King* involved testimony from a detective about CSAAS and the procedure used in Laurel County for assessing whether to bring charges against a suspect in a child sex abuse case. *Id.* at 527-28. The detective testified that a delay in reporting was not unusual in child sex abuse cases and gave testimony implying that law enforcement and child welfare experts reviewed the case and decided that it should be prosecuted. *Id.* at 527.

15

In this case, after reviewing the forensic interviewer's testimony, nothing she said implied that she determined the case was worth prosecuting or bolstered any of M.W.'s testimony.

The forensic interviewer explained the organization she worked for, and described the interview process, stating that an interviewer is a neutral party who knows nothing about the case. The interviewer asks general, open-ended questions and it is up to a child to disclose if any abuse has occurred. She stated that interviewers would never ask questions such as "Were you sexually abused?" Regarding this case, she stated that she interviewed M.W. and that a detective viewed the interview via video from a separate room. She stated that M.W. made a disclosure during the interview, and Whiteside immediately objected to this testimony. Although the bench conference is inaudible, after the objection was made, the interviewer was dismissed and no further testimony was provided. This does not rise to the level of bolstering. In no way did the interviewer testify regarding her opinion as to whether the case should be prosecuted. She merely outlined the interview process and stated that M.W. made a disclosure. She did not state that M.W. was credible or that she believed him, nor did she state what M.W. disclosed. Her opinion regarding M.W.'s truthfulness was not implicit in her testimony, and there was no bolstering.

The same can be said for the aunt's and uncle's testimony. They did not comment on M.W.'s truthfulness. The aunt merely explained why they did not report the abuse sooner, and the uncle stated that he and M.W. discussed the

16

oral sex. The trial court properly limited the uncle's testimony to avoid any hearsay issues. In sum, given the nature and content of the testimony of these three witnesses, we cannot say that the trial court erred in overruling Whiteside's objections as to bolstering.

## V. The trial court erred in allowing the Commonwealth to comment on Whiteside's lack of denial, but this was not palpable error.

During closing arguments, the Commonwealth made the following argument:

> And then lastly, the thing I want to highlight, that I hope you all noticed. In the July 2nd interview – that was the one that you all actually got to see the audio and the video. And I know we just played portions of it. But the portions that we played, Detective Roby is asking the defendant, she's talking to her about blowjobs, she's talking to her about sex, and what is the defendant doing? She's nodding along. Yes, mhmm, mhmm." Now, she's not outright admitting it, she's not denying it. She's being accused of having sex and oral sex with a minor and she's just sitting there going (counsel nods), nodding her head. She's not disputing it. I would submit to you that that is an admission of guilt. She is not denying these allegations. And Detective Roby continues to bring it up. Several times she's talking about it. Defendant just nods along. Doesn't deny it.

Although during the interview Whiteside made minimal comments, such as "mhmm," and nodded her head as the detective recounted the reported incidents, the Commonwealth highlighted her lack of denial and the lack of denial essentially equates to silence.[1] Whiteside argues that these statements

---

[1] During the trial testimony of the detective who interviewed Whiteside, the Commonwealth introduced clips from the six-and-a-half-hour interview of Whiteside after her arrest. While most of the discussion is audible, the video does not clearly show the image from the interview and therefore whether Whiteside was nodding along with the detective could not be confirmed by the record.

amount to the Commonwealth impermissibly commenting upon her silence in violation of the Fifth Amendment. This alleged error is not preserved and is therefore reviewed for palpable error.

Palpable error review requires reversal when "manifest injustice has resulted from the error." *Elery v. Commonwealth*, 368 S.W.3d 78, 98 (Ky. 2012) (quoting Kentucky Rule of Criminal Procedure (RCr) 10.26). In determining whether there has been manifest injustice, the Court focuses "on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Martin v. Commonwealth*, 207 S.W.3d 1, 5 (Ky. 2006).

"The Commonwealth is prohibited from introducing evidence or commenting in any manner on a defendant's silence once that defendant has been informed of his rights and taken into custody." *Hunt v. Commonwealth*, 304 S.W.3d 15, 35, (Ky. 2010). The interview referenced in the closing argument occurred after Whiteside was arrested and read her *Miranda* rights.[2] She signed a waiver and voluntarily participated in the interview. If the defendant is "prejudiced by reference to the exercise of his constitutional right" to remain silent, it can constitute reversible error. *Id.* at 36 (quoting *Wallen v. Commonwealth*, 657 S.W.2d 232, 233 (Ky. 1983)).

Although during the interview Whiteside makes minimal responses to the detective's statements, such as "mhmm" and "yes," the Commonwealth focused

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

18

on Whiteside's lack of denial and equated it with an admission of guilt. We agree with Whiteside that the Commonwealth's statements regarding her lack of denial were improper. However, to warrant reversal, this unpreserved error must have resulted in manifest injustice. "[W]hen reviewing for manifest injustice, the court must discern whether there is a substantial possibility that, but for the error, the verdict would have been different or resulted in a fundamentally unfair trial. Otherwise, the unpreserved error will be held non-prejudicial." *Nunn v. Commonwealth,* 461 S.W.3d 741, 751 (Ky. 2015).

"[N]ot every isolated instance referring to post-arrest silence will be reversible error." *Wallen,* 657 S.W.2d at 233. Reversal is typically warranted where the Commonwealth repeatedly mentions and emphasizes post-arrest silence. *Nunn,* 461 S.W.3d at 751. While we recognize that the Commonwealth's comments were improper, the lack of denial was not overly emphasized, and it is unlikely that the jury's verdict would have been different if the comments were not made. Further, there was sufficient evidence, regardless of the comments made in closing, to establish Whiteside's guilt, such as M.W.'s extensive testimony; his sister's testimony, stating she witnessed one of the inappropriate encounters between M.W. and Whiteside; and DNA evidence which corroborated M.W.'s allegations of sexual abuse. We are satisfied that, given the weight of the evidence, no palpable error occurred.

19

## VI. There were no cumulative errors during trial that resulted in fundamental unfairness.

Finally, Whiteside argues that cumulative errors during trial resulted in fundamental unfairness and summarizes each of the five errors alleged above. She asserts that all the errors during trial acted together to render the trial fundamentally unfair. "We have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). In this case, only the alleged error regarding closing arguments had any merit and even still, the error did not result in the manifest injustice required under our palpable error standard. Although a small error "crept into this trial," it did not individually or cumulatively render the trial unfair. *Id.*

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the Jefferson Circuit Court.

All sitting. Minton, C.J.; Buckingham, Hughes, Keller, VanMeter and Wright, JJ., concur. Lambert, J., concurs in part and dissents in part.

LAMBERT, J., CONCURRING IN PART AND DISSENTING IN PART: I concur except would hold that no error occurred when the Commonwealth referred to Whiteside nodding her head during her interrogation as an admission. Whiteside had waived her right to remain silent and was actively participating in the interrogation, thus no error occurred.

20

COUNSEL FOR APPELLANT:

John Casey McCall


COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Joseph A. Newberg II
Assistant Attorney General
Office of Criminal Appeals